TREVOR J. ZINK, ESQ. (218860)
RAY D. HACKE, ESQ. (276318)
**OMNI LAW GROUP, LLP**
1940 Hamilton Avenue
San Jose, CA 95125
Tel: (408) 879-8500 / Fax: (408) 879-8501
Email: tzink@omnilawgroup.com

Attorneys for Plaintiff
PAZ GAMING, INC.

## UNITED STATES DISTRICT COURT

### IN AND FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| PAZ GAMING, INC., a California corporation,<br><br>        Plaintiff,<br><br>v.<br><br>RACING CARD DERBY HOLDINGS, LTD., an Australian company; ANTHONY JAMES BROWN, an individual; and DOES 1-100,<br><br>        Defendant(s). | CASE NO.:  2:15-CV-09199<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF IN ACTION FOR:**<br>    **1. Patent Infringement;**<br>    **2. Intentional Interference With Contractual Relations; and**<br>    **3. Unreasonable Restraint of Trade**<br><br>**JURY TRIAL DEMANDED** |

        COMES NOW Plaintiff PAZ GAMING, INC. and files the herein Complaint for Damages and Injunctive Relief in Action for Patent Infringement against Defendants RACING CARD DERBY HOLDINGS, LTD., ANTHONY JAMES BROWN, and DOES 1-100, and in support thereof alleges, as follows:

### PARTIES

        1.        Plaintiff PAZ GAMING, INC. is, and at all times material herein was, a corporation organized in, existing under the laws of, and headquartered in the State of California.

        2.        Plaintiff is informed and believes, and based thereon alleges, that Defendant RACING CARD DERBY HOLDINGS, LTD. ("RCD") is, and at all times material herein was, a

public company organized and existing under the laws of Australia which has systematic and continuous contacts with the State of California that approximate a physical presence within the state.

3.      Plaintiff is informed and believes, and based thereon alleges, that Defendant JAMES ANTHONY BROWN ("BROWN") is, and at all times material herein was, a citizen of Australia and the founder, owner, chief officer, and an agent of RCD.

4.      Plaintiff is unaware of the true names and capacities of the individuals sued herein as DOES 1 through 100, inclusive, and therefore sues such Defendants by such fictitious names. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that the damages herein alleged have been caused by their conduct.  Plaintiff will seek leave of this Court to amend this Complaint to show their true names and capacities when the same have been ascertained.

### JURISDICTION AND VENUE

5.      This is an action for violation of the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*  Pursuant to 28 U.S.C. §§ 1331 and 1338, this Court has original jurisdiction over the subject matter of the herein action.

6.      This Court has personal jurisdiction over Defendants in that each Defendant transacts business in this District and/or has committed acts within this District giving rise to this action.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) in that Defendants each do business in this District, have committed acts of infringement in this District, and continue to commit acts of infringement in this District, entitling Plaintiff to the relief sought herein.

### FIRST CLAIM FOR RELIEF

### Infringement of Patent No. 6,079,713 – Against RCD and BROWN

8.      Plaintiff refers to and incorporates herein by reference paragraphs 1 through 7 of this Complaint as if set forth in full herein.

COMPL. FOR DAMAGES AND INJUNCTIVE RELIEF IN ACTION FOR PATENT INFRINGEMENT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, AND UNREASONABLE RESTRAINT OF TRADE

9.     On June 27, 2000, U.S. Patent No. 6,079,713 (the "Patent") was duly and legally issued for an invention entitled "Method of Playing a Game of Chance." The invention is a card game (the "Game") designed to be used at card tables at casinos. Plaintiff is, and at all times material herein was, a co-filer and owner of the Patent, a true and correct copy of which is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

10.     RCD and BROWN have infringed, and continue to infringe, the Patent by their use, distribution, import, sale and/or offer for sale of the Game, and by their contributing to and inducement of others to use, distribute, sell and/or offer for sale infringing games. RCD's and BROWN's infringing acts will continue unless enjoined by this Court. RCD and BROWN are liable for infringement of the Patent pursuant to 35 U.S.C. § 271.

11.     Plaintiff is informed and believes, and based thereon alleges, that RCD's and BROWN's infringement and/or continued infringement of the Patent, whether direct, contributory, and/or by inducement, has been, and continues to be, knowingly, willful, and/or objectively reckless. More specifically, the Defendants' knowledge of the invention and willful infringement is evidenced by the following:

    a.   The Game's inventor, Jesse J. Paz, obtained the Paz Patent on June 27, 2000. *See* Ex. "A."

    b.   Plaintiff entered into a 10-year license agreement (the "Agreement") with DEQ Systems Corp. ("DEQ"), pursuant to which DEQ acquired the rights to sublicense the Game in exchange for a royalty to be paid to Plaintiff.

    c.   RCD sent DEQ a letter accusing DEQ of stealing RCD's intellectual property by marketing Plaintiff's patented Game, which was the sole reason that DEQ terminated the Agreement.

    d.   Thereafter, upon hearing that DEQ licensed the patented game from Plaintiff, RCD refused to retract its claim to ownership, which caused DEQ to stand by its decision to terminate the Agreement pending resolution of the disputed claim.

12.     Defendants' acts of infringement, as set forth herein, have caused, and continue to cause, damage to Plaintiff, and Plaintiff is entitled to recover from Defendants' wrongful acts in

COMPL. FOR DAMAGES AND INJUNCTIVE RELIEF IN ACTION FOR PATENT INFRINGEMENT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, AND UNREASONABLE RESTRAINT OF TRADE

3

1   an amount subject to proof at trial, including punitive damages for willful infringement.

2   Defendants' infringement of the Patent will continue to damage Plaintiff, causing Plaintiff

3   irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

4   Considering the balance of hardships between Plaintiff and Defendants, a permanent injunction

5   is warranted.  The public interest will not be disserved by entry of such an injunction.  In fact,

6   use of the Patent without enjoining Defendants from infringing the Patent will inevitably cause

7   consumer confusion.

## SECOND CLAIM FOR RELIEF

### Intentional Interference With Contractual Relations – Against RCD and BROWN

10      13.      Plaintiff refers to and incorporates herein by reference paragraphs 1 through 12 of

11   this Complaint as if set forth in full herein.

12      14.      Plaintiff entered into the Agreement with DEQ for the purpose of licensing and

13   distributing the Game.  *See* Ex. "B."

14      15.      RCD and BROWN knew of the Agreement.

15      16.      Despite knowing of the Agreement, RCD, acting through BROWN, intentionally

16   acted to disrupt the contractual relationship between Plaintiff and DEQ by misrepresenting to

17   DEQ that the rights to the Game belonged to RCD, not to Plaintiff.

18      17.      As a direct result of RCD's and BROWN's actions, DEQ terminated its

19   Agreement with Plaintiff.

20      18.      As a direct result of RCD's and BROWN's disruption of Plaintiff's Agreement

21   with DEQ, Plaintiff has suffered damages in the form of lost profits that would have been

22   realized under the Agreement, all in an amount according to proof at trial.

## THIRD CLAIM FOR RELIEF

### Unreasonable Restraint of Trade – Against RCD, BROWN, and DOES-100

25      19.      Plaintiff refers to and incorporates herein by reference paragraphs 1 through 18 of

26   this Complaint as if set forth in full herein.

27      20.      RCD, BROWN, and DOES 1-100, which are casinos whose names are currently

28   unknown to Plaintiff, entered into contracts pursuant to which RCD was to be the exclusive

provider of Plaintiff's patented Game to DOES 1-100, under the color of ownership by RCD.

21.     The purpose of these contracts was to injure competition – specifically, to prevent Plaintiff from making a profit from the marketing, sale, and use of its Game.

22.     RCD's agreements with DOES 1-100 have caused injury to Plaintiff, who not only lost the Agreement with DEQ, but has been prevented from entering into contracts for the marketing, sale, and use of the Game that Plaintiff invented and for which Plaintiff holds the patent.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests entry of judgment in its favor and against each Defendant, including the following:

1. For a finding that Defendants RCD and BROWN infringed the Patent;

2. For a permanent injunction enjoining Defendant RCD and BROWN, and their subsidiaries, joint venturers, agents, servants, officers, directors, and employees, and all persons acting under, in concert with, or for either or both from further infringement, contributory infringement and/or inducing infringement of the Patent;

3. For an award of damages arising out of Defendants' infringement of the Patent, adequate to compensate Plaintiff for the infringing act(s), but in no event less than a reasonable royalty for the use made of the inventions of the Patent as provided in 35 U.S.C. § 284;

4. For an award of treble damages pursuant to 35 U.S.C. § 284;

5. For a finding that this case is an exceptional case, and for an award of reasonable attorney's fees to Plaintiff pursuant to 35 U.S.C. § 285 and/or as otherwise permitted by law;

6. For compensatory damages resulting from each Defendant's wrongful interference with Plaintiff's contractual relationships, in an amount according to proof at trial;

7. For an award of pre-judgment and post-judgment interest in amounts according to

COMPL. FOR DAMAGES AND INJUNCTIVE RELIEF IN ACTION FOR PATENT INFRINGEMENT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, AND UNREASONABLE RESTRAINT OF TRADE

5

proof at trial;

8. For costs of suit incurred herein; and

9. For such other and further relief as the Court deems just and proper.

Dated: November 12, 2015

**OMNI LAW GROUP, LLP**

By: _/s/ Trevor J. Zink_
      TREVOR J. ZINK, ESQ.
      Lead Counsel
      Cal. State Bar No. 218860
      Email: tzink@omnillp.com
      OMNI LAW GROUP, LLP
      1940 Hamilton Ave.
      San Jose, CA 95125
      Telephone: (408) 879-8500
      Facsimile: (408) 879-8501

      Attorneys for Plaintiff
      PAZ GAMING, INC.

COMPL. FOR DAMAGES AND INJUNCTIVE RELIEF IN ACTION FOR PATENT INFRINGEMENT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, AND UNREASONABLE RESTRAINT OF TRADE

6

EXHIBIT "A"

US006079713A

# United States Patent [19]

## Paz

[11] **Patent Number:** **6,079,713**

[45] **Date of Patent:** **Jun. 27, 2000**

[54] **METHOD OF PLAYING A GAME OF CHANCE**

[76] Inventor: **Jesse J. Paz**, 1204 Hartview Ave., Valinda, Calif. 91744

[21] Appl. No.: **09/007,023**

[22] Filed: **Jan. 14, 1998**

[51] Int. Cl.⁷ ........................................... **A63F 1/00**

[52] U.S. Cl. .................................................. **273/292**

[58] Field of Search ........................... 273/246, 292, 273/239

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,463,871 | 8/1923 | Chisolm | 273/246 |
| 2,022,533 | 11/1935 | Blank | 273/246 |
| 2,062,168 | 11/1936 | Entwistle | 273/246 |

5,398,938  3/1995  Money ...................................... 273/237

OTHER PUBLICATIONS

"Horse Race", Scarne's Encyclopedia of Games by John Scarne, Harper & Row Publishers, pp. 314, 315, 1973.

*Primary Examiner*—Benjamin H. Layno

[57] **ABSTRACT**

A method of playing a game of chance is disclosed which allows players to place bets on the occurrence of any of a plurality of events. The occurrence of each event cannot be controlled or influenced by the player and cannot be predicted. A player betting on an occurrence that four cards of a particular suit will be dealt by a dealer before any four cards of any other suit are dealt is paid at true odds of 3–1 upon occurrence of the event. Other bet options yield other odds.

**15 Claims, 1 Drawing Sheet**





Figure 1

6,079,713

**1**

# METHOD OF PLAYING A GAME OF CHANCE

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to games and, more particularly, to games of chance using decks of playing pieces.

### 2. Description of Related Art

Card games have existed where each player is dealt a number of cards and then has an option of receiving additional cards. Common objects of typical card games are for each player to accumulate a desired collection of cards. The inventor is unaware of any games which utilize playing pieces and which simulate in some ways the action of a horse race.

## SUMMARY OF THE INVENTION

A method of playing a game of chance is disclosed which allows players to place bets on the occurrence of any of a plurality of events. The occurrence of each event cannot be controlled or influenced by the player and cannot be predicted. A player betting on an occurrence that four cards of a particular suit will be dealt by a dealer before any four cards of any other suit are dealt is paid at true odds of 3–1 upon occurrence of the event. Other bet options yield other odds.

The present invention, together with additional features and advantages thereof, may best be understood by reference to the following illustrative description taken in connection with the accompanying illustrative drawings.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 illustrates the preferred layout of the table of the present invention which is used in connection with the method of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring more particularly to the drawing, FIG. 1 illustrates a playing surface 11 in accordance with the presently preferred embodiment. The playing surface 11 preferably comprises seven player positions 13 and a dealer position 15. The player positions 13 and the dealer position 15 are all disposed around a playing field 17.

Each player position 13 comprises a betting template 19. Each betting template 19 comprises a Heart row 22, a Diamond row 24, a Club row 26, and a Spade row 28. Each betting template 19 further comprises a win column 30, a place column 33, and a show column 35. The four rows 22, 24, 26 and 28, respectively, and the three columns 30, 33 and 35, respectively, form a matrix having twelve bet positions. A player can place one or more tokens on one or more of the twelve wager positions to indicate the player's bet. For example, a player placing a token on the upper right wager position, corresponding to the Heart row 22 and the show column 35, bets that the Hearts suit will "show," as described below.

The betting template 19 further comprises a Joker betting area 37, a Trifecta betting area 39, and a Trifecta layout matrix 42. A player betting on Jokers places a token in the Joker betting area 37. A player betting on Trifecta places a token in the Trifecta betting area 39, and also places three indicator tokens (not shown) in the Trifecta layout matrix 42.

**2**

A first indicator token will indicate a "win," a second indicator token will indicate a "place," and a third indicator token will indicate a "show." The player places the three indicator tokens in the Trifecta layout matrix 42 to indicate the player's bet of the three suits which the player believes will obtain the win, place, and show statuses.

The playing field 17 comprises a first Spade position 45, a second Spade position 47, and a third Spade position 49. The playing field 17 further comprises a first Club position 51, a second Club position 53, and a third Club position 55, and further comprises a first Diamond position 57, a second Diamond position 59, and a third Diamond position 61. The playing field 17 further comprises a first Heart position 63, a second Heart position 65, and a third Heart position 67. A win position 69, a place position 72, and a show position 74 are disposed to the dealer's right of the positions 45, 57, 49, 51, 53, 55, 57, 59, 61, 63, 65 and 67. The playing field 17 further comprises a first Joker position 76 and a second Joker position 78.

The method of the present invention is preferably implemented on a standard Twenty-One Table. The dealer at the dealer position 15 controls the game but does not compete against the players. In the presently preferred embodiment, the method comprises a casino-banked game, which uses a single deck of poker-style cards comprising fifty-two cards and two Joker cards. In alternative embodiments of the present invention, other numbers of cards or decks of cards or playing pieces may be used.

The method of the present invention is in some ways analogous to a race. Each player can place one or more bets in the betting template 19 to indicate the player's bet on the card suit which will first be drawn four times to "win," the card suit which will subsequently be drawn four times to "place," and the card suit which will finally be drawing four times to "show." Players may bet on one or two or all three of the suits. For example, a player may bet on the proposition that the Hearts suit will win. Alternatively, a player may bet on all three propositions by betting, for example, that the Spades suit will win, that the Diamond suit will place, and that the Hearts suit will show. Each proposition pays off at 3-to-1 odds. Unlike a pari-mutual betting system, a player who has a "place" bet on a suit does not win if the suit earns a "win." Similarly, players who have a show bet on a suit do not win if the suit earns a win or a place. The suit must finish in the position which the bet specifies. In alternative embodiments, other ranking schemes may be implemented.

In accordance with the method of the present invention, players can also bet on a Trifecta, which proposition indicates the exact order in which the three suits will finish the race in win, place, and show positions. The Trifecta bet pays off at 23-to-1 odds. In the presently preferred embodiment where Joker cards are used, the two Jokers serve as a fifth suit. In an event where the two Joker cards are drawn from the deck before any other suit has attained a win, the House wins all of the wagers on the table. The players, however, may also bet on the Joker suit, which is paid off at 27-1 odds.

In accordance with the method of the present invention, the dealer begins dealing cards face-up from a shuffled deck of cards, after all wagers are in place on the betting templates 19 of the respective players. The dealer draws cards from the deck, one card at a time, and places the cards, beginning at the dealer's left, in the respective positions in the playing field. The first Heart that is drawn, for example, is placed in the first Heart position 63. The second Heart card that is drawn from the deck is placed in the second Heart position 65, and the third Heart card that is drawn from the deck is

6,079,713

| 3 | 4 |

placed in the third Heart position **67**. Additionally, when Joker cards are used, the first Joker card drawn from the deck is placed in the first Joker position **76**, and the second Joker card drawn from the deck is placed in the second Joker position **78**.

As cards are drawn from the deck and placed in their respective positions in the playing field **17**, according to their suits, the card suit having more cards drawn in that suit will progress faster through the first, second, and third positions from the dealer's left to the dealer's right.

As an example of the game play, if a very first card dealt from the deck is a Club card, then this first card is placed in the first Club position **51**. If a second card dealt from the deck is a Diamond card, then the second card is placed in the first Diamond position **57**. If a third card dealt from the deck is a Heart card, then this card is placed in the first Heart position **63**. If a fourth card dealt from the deck is also a Heart card, then this fourth card is placed in the second Heart position **65**. If a fifth card dealt from the deck is a Diamond card, then this fifth card is placed in the second Diamond position **59**. If a sixth card dealt from the deck is also a Diamond card, then the sixth card is placed in the third Diamond position **61**. If, by chance, the seventh card drawn from the deck is also a Diamond card, then this seventh card would be placed in the win position **69**. Accordingly, the Diamond suit would obtain the win status. The win status indicates, in this example, that the Diamond suit is the first suit to be exposed four times during the game play.

After a win status occurs for a given suit, indicating that the suit has first been exposed four times before any other suit, and the fourth card having the winning suit is placed in the win position **69**, the dealer continues to draw cards and to place the cards in the playing field **17** until a second suit has been exposed four times. The fourth card of the second suit is placed in the place position **72**. As the game play continues, cards which are drawn having the win suit are placed in the win position **69**, and cards which are drawn having the place suit are placed in the place position **72**. Other cards are placed in open spaces on the playing field **17**, according to their suit, until a third suit is exposed four times. The fourth card that is dealt of this third suit is placed in the show position **74**. Joker cards, which are dealt after the placement of a card in the win position **69**, are not meaningful, but are placed in their appropriate positions **76**, **78** if drawn.

If two Joker cards are drawn before any four cards of a particular suit are drawn, then the game ends and the House wins, in addition to any player that has bet on this Joker proposition, who also wins. Generally, the game ends after either a card is placed in the show position **74**, unless two Joker cards are dealt before a card is placed in the win position **69**.

The occurrence of two Joker cards being dealt before a card is placed in the win position **69** ends the game. After the game play has ended, the dealer collects the cards in the playing field **17**, with the exception of the cards in the win position **69**, the place position **72**, the show position **74**, the first Joker position **76**, and the second Joker position **78**. The dealer then collects and pays tokens to the various players in accordance with the outcome of the game and the players respective bets. The dealer next collects the remaining cards from the playing field **17** and shuffles the cards for another round of play. Two detailed examples of game play are provided below:

### EXAMPLE 1

Player 1 Bets Diamonds to Win, Spades to Place.
Player 2 Bets Clubs to Win, Hearts to Show.

Player 3 Bets Hearts to Win, Clubs to Place, Spades to Show.
Player 4 Bets Clubs to Place. Also places optional bet on the House.
Player 5 Bets Diamonds to Win. Also places optional Trifecta bet, Diamonds to Win, Clubs to Place, Spades to Show.
Player 6 Bets Diamonds to Win, Hearts to Place.
Player 7 Bets Diamonds to Win, Clubs to Place, Spades to Show.

In this race assume: Diamonds Win, Clubs Place, Spades Show.
Player 1 Collects on the Win bet, loses the Place bet.
Player 2 Loses both the Win and Show bets.
Player 3 Loses the Win bet, collects on the Place and Show bets.
Player 4 Collects on the Place bet, loses the House bet.
Player 5 Collects the Win bet. Also collects on the Trifecta bet.
Player 6 Collects on the Win, loses the Place bet.
Player 7 Collects on the Win, Place and Show bets.
Note: Above Win, Place And Show bet payouts are 3-1. Trifecta payout 23-1.

### EXAMPLE 2

Player 1 Bets Hearts to Win, Diamonds to Place.
Player 2 Bets Spades to Show. Also bets on Jokers, (House.)
Player 3 Bets Trifecta, (Diamonds to Win, Clubs to Place, Hearts to Show.) Also bets on Jokers.
Player 4 Bets Hearts and Clubs to Win.
Player 5 Bets Spades to Win, Diamonds to Show.
Player 6 Bets Jokers.
Player 7 Bets Diamonds to Win, Hearts to Show. Bets Trifecta, (Diamonds to Win, Clubs to Place, Hearts to Show.)

In this race assume: Jokers Win. In order for this to happen the two Jokers must be exposed prior to any suit attaining a Win.
Player 1 Loses Win and Place bets.
Player 2 Loses Show bet. Collects on Joker bet.
Player 3 Loses Trifecta bet. Collects on Joker bet.
Player 4 Loses both Win bets.
Player 5 Loses Win and Show bets.
Player 6 Collects on Joker bet.
Player 7 Loses Win and Show bets. Loses Trifecta bet.
Note: Joker bet payout is 27-1.

In accordance with the presently preferred embodiment, the win, place, and show propositions are each paid at true odds of 3-1. The House advantage is derived solely from the House wins when the two Jokers are drawn before the occurrence of a suit win event. The frequency of both Jokers being drawn first has been determined by simulating 2 million games of the present invention using a computer. In this computer simulation, the House won 67,989 times out of the 2 million games, which corresponds a win percentage of approximately 3.4%. The "vig" of 3.4% on the proposition of two Jokers being drawn first is competitive with other casino table games. The House Advantage on the proposition that both Jokers will be drawn before a suit win occurs is derived from the same figure. If 1,000 games are played and the House wins 34 of the games, players on that proposition will be paid 34×28, which is 952 bet units, yielding the House a vig of 4.8%. The Trifecta is paid at 23-1, which is in accordance with true odds, since twenty-four unique sequences can be created with four suits and each unique sequence is equally likely to win. The frequency of House Wins determines the vig in this instance as well. Accordingly, the 3.4% figure is the vig on the Trifecta proposition.

6,079,713

5

Although an exemplary embodiment of the invention has been shown and described, many other changes, modifications and substitutions, in addition to those set forth in the above paragraphs, may be made by one having ordinary skill in the art without necessarily departing from the spirit and scope of this invention.

I claim:

1. A method of playing a game of chance among a plurality of players, the method comprising the following steps:

(a) providing a set of playing pieces, the set of playing pieces comprising a number of first playing pieces each of said first playing pieces having a first suit, a number of second playing pieces each of said second playing pieces having a second suit, a number of third playing pieces each of said third playing pieces having a third suit, and a number of fourth playing pieces each of said fourth playing pieces having a fourth suit, each of said suits being distinguishable from each other, and each suit having an equal number of playing pieces;

(b) placing at least one wager by each of the plurality of players, each wager of each player corresponding to at least one of:

(1) a first scenario wherein a win occurs if a first predetermined number, which is greater than one, of the first playing pieces is dealt by a dealer before a second predetermined number of the second playing pieces is dealt by the dealer; and

(2) a second scenario wherein a win occurs if the second predetermined number, which is greater than one, of the second playing pieces is dealt by the dealer before the first predetermined number of the first playing pieces is dealt by the dealer;

(c) dealing by the dealer at least one playing piece from the set of playing pieces;

(d) determining whether the first predetermined number of first playing pieces has been dealt by the dealer;

(e) determining whether the second predetermined number of second playing pieces has been dealt by the dealer;

(f) repeating steps (c) through (e) until either the first predetermined number of first pieces has been dealt by the dealer or the second predetermined number of second playing pieces has been dealt by the dealer.

2. The method of playing a game of chance as recited in claim 1, wherein the step of providing a set of playing pieces comprises a step of providing a set of playing cards, and 2 Joker cards.

3. The method of playing a game of chance as recited in claim 1, wherein the step of placing at least one wager by each of the plurality of players comprises a step of placing at least one wager by each of the plurality of players wherein each wager of each player further corresponds to at least one of:

(3) a third scenario wherein a win occurs if a third predetermined number of the third playing pieces is dealt by the dealer before the first predetermined number of the first playing pieces is dealt by the dealer, before the second predetermined number of the second playing pieces is dealt by the dealer, and before a fourth predetermined number of the fourth playing pieces is dealt by the dealer; and

(4) a fourth scenario wherein a win occurs if the fourth predetermined number of the fourth playing pieces is dealt by a dealer before the first predetermined number of the first playing pieces is dealt by the dealer, before

6

the second predetermined number of the second playing pieces is dealt by the dealer, and before the third predetermined number of the third playing pieces is dealt by the dealer.

4. A method of playing a game of chance among a plurality of players, the method comprising the following steps:

(a) providing a set of playing pieces, the set of playing pieces comprising a number of first playing pieces each of said first playing pieces having a first suit, a number of second playing pieces each of said second playing pieces having a second suit, a number of third playing pieces each of said third playing pieces having a third suit, and a number of fourth playing pieces each of said fourth playing pieces having a fourth suit, each of said suits being distinguishable from each other, and each suit having an equal number of playing pieces;

(b) placing at least one wager by each of the plurality of players, each wager of each player corresponding to at least one of:

(1) a first scenario wherein a win occurs if a first predetermined number, which is greater than one, of the first playing pieces is dealt by a dealer before a second predetermined number, which is greater than one, of the second playing pieces is dealt by the dealer; and

(2) a second scenario wherein a win occurs if the second predetermined number of the second playing pieces is dealt by the dealer before the first predetermined number of the first playing pieces is dealt by the dealer;

(c) dealing by the dealer a playing piece from the set of playing pieces, the playing piece being dealt by the dealer onto an area which is substantially centrally located among the plurality of players, and the playing piece being dealt by the dealer onto the area in an orientation to render an attribute of the playing piece discernible by each of the plurality of players;

(d) determining whether the first predetermined number of first playing pieces has been dealt by the dealer;

(e) determining whether the second predetermined number of second playing pieces has been dealt by the dealer;

(f) repeating steps (c) through (e) until either the first predetermined number of first playing pieces has been dealt by the dealer or the second predetermined number of second playing pieces has been dealt by the dealer.

5. The method of playing a game of chance as recited in claim 4, wherein:

the step of placing at least one wager by each of the plurality of players comprises a step of placing at least one wager by each of the plurality of players wherein each wager of each player further corresponds to at least one of:

(3) a third scenario wherein a win occurs if a third predetermined number of the third playing pieces is dealt by the dealer before the first predetermined number of the first playing pieces is dealt by the dealer, before the second predetermined number of the second playing pieces is dealt by the dealer, and before a fourth predetermined number of the fourth playing pieces is dealt by the dealer; and

(4) a fourth scenario wherein a win occurs if the fourth predetermined number of the fourth playing pieces is dealt by a dealer before the first predetermined number of the first playing pieces is dealt by the

6,079,713

7

dealer, before the second predetermined number of the second playing pieces is dealt by the dealer, and before the third predetermined number of the third playing pieces is dealt by the dealer.

6. The method of playing a game of chance as recited in claim 5, wherein the step of providing a set of playing pieces comprises a step of providing a set of shuffled playing pieces, wherein the first playing pieces, the second playing pieces, the third playing pieces, and the fourth playing pieces are shuffled together in a substantially random order.

7. The method of playing a game of chance as recited in claim 6, further comprising an initial step of providing a table having a playing surface and a periphery, the plurality of players being arranged about the periphery, wherein the playing surface comprises playing piece receiving areas and wagering areas.

8. The method of playing a game of chance as recited in claim 7, wherein the set of playing pieces corresponds to a deck of cards.

9. A method of playing a game of chance among a plurality of players, the method comprising the following steps:

(a) providing a set of playing pieces, the set of playing pieces comprising a number of first playing pieces each of said first playing pieces having a first suit, a number of second playing pieces each of said second playing pieces having a second suit, a number of third playing pieces each of said third playing pieces having a third suit, and a number of fourth playing pieces each of said fourth playing pieces having a fourth suit, each of said suits being distinguishable from each other, and each suit having an equal number of playing pieces;

(b) placing at least one wager by each of the plurality of players, each wager of each player corresponding to at least one of:

(1) a first scenario wherein a win occurs if a first predetermined number, which is greater than one, of the first playing pieces is dealt by a dealer before a second predetermined number, which is greater than one, of the second playing pieces is dealt by the dealer and before a third predetermined number which is greater than one, of the third playing pieces is dealt by the dealer;

(2) a second scenario wherein a win occurs if the second predetermined number of the second playing pieces is dealt by a dealer before the first predetermined number of the first playing pieces is dealt by the dealer and before the third predetermined number of the third playing pieces is dealt by the dealer;

(3) a third scenario wherein a win occurs if the third predetermined number of the third playing pieces is dealt by a dealer before the first predetermined number of the first playing pieces is dealt by the dealer and the second predetermined number of the second playing pieces is dealt by the dealer; and

(4) a fourth scenario wherein a win occurs if the first predetermined number of the first playing pieces is dealt by a dealer before the second predetermined number of the second playing pieces is dealt by the dealer, and if the second predetermined number of the second playing pieces is dealt by the dealer before the third predetermined number of the third playing pieces is dealt by the dealer; and

(c) dealing by the dealer at least one playing piece from the set of playing pieces;

8

(d) determining whether the first predetermined number of the first playing pieces has been dealt by the dealer;

(e) determining whether the second predetermined number of the second playing pieces has been dealt by the dealer;

(f) determining whether the third predetermined number of the third playing pieces has been dealt by the dealer;

(g) repeating steps (c) through (f) until either the first predetermined number of the first playing pieces has been dealt by the dealer, the second predetermined number of the second playing pieces has been dealt by the dealer, or the third predetermined number of the third playing pieces has been dealt by the dealer.

10. The method of playing a game of chance as recited in claim 9, wherein the step of placing at least one wager by each of the plurality of players comprises a step of placing at least one wager by each of the plurality of players, each wager of each player corresponding to at least one of:

(1) a first scenario wherein a win occurs if the first predetermined number of the first playing pieces is dealt by a dealer before the second predetermined number of the second playing pieces is dealt by the dealer, and before the third predetermined number of the third playing pieces is dealt by the dealer, and before a fourth predetermined number, which is greater than one, of the fourth playing pieces is dealt by the dealer;

(2) a second scenario wherein a win occurs if the second predetermined number of the second playing pieces is dealt by a dealer before the first predetermined number of the first playing pieces is dealt by the dealer, and before the third predetermined number of the third playing pieces is dealt by the dealer, and before the fourth predetermined number of the fourth playing pieces is dealt by the dealer;

(3) a third scenario wherein a win occurs if the third predetermined number of the third playing pieces is dealt by a dealer before the first predetermined number of the first playing pieces is dealt by the dealer, and before the second predetermined number of the second playing pieces is dealt by the dealer, and before the fourth predetermined number of the fourth playing pieces is dealt by the dealer; and

(4) a fourth scenario wherein a win occurs if the fourth predetermined number of the fourth playing pieces is dealt by a dealer before the first predetermined number of the first playing pieces is dealt by the dealer, and before the second predetermined number of the second playing pieces is dealt by the dealer, and before the third predetermined number of the third playing pieces is dealt by the dealer.

11. The method of playing a game of chance as recited in claim 10, wherein the first predetermined number is four, the second predetermined number is four, the third predetermined number is four, and the fourth predetermined number is four.

12. The method of playing a game of chance as recited in claim 11, wherein the four suits of said set of playing pieces correspond to four suits of playing at least one deck of cards.

13. The method of playing a game of chance as recited in claim 12, wherein the step of dealing by the dealer at least one playing piece from the set of playing pieces comprises a step of placing the at least one playing piece in an area on a playing surface that corresponds to a suit of the playing

6,079,713

9

piece, wherein playing pieces dealt by the dealer having different suits are placed in different areas on the playing surface.

14. The method of playing a game of chance as recited in claim 12, wherein the step of dealing by the dealer at least one playing piece from the set of playing pieces comprises a step of placing the at least one playing piece in an area on a playing surface that corresponds to a suit of the playing piece, the at least one playing piece being placed in the area

10

on the playing surface in an orientation to facilitate a user to discern a suit of the at least one playing piece, wherein playing pieces dealt by the dealer having different suits are placed in different areas on the playing surface.

15. The method of playing a game of chance as recited in claim 10, wherein the set of playing pieces comprises at least one deck of cards.

*   *   *   *   *

EXHIBIT "B"



DIGITAL
ENTERTAINMENT

# License Agreement

This License Agreement (the "**Agreement**") is made and entered into this __6th__ day of __October__, 2013 (the "**Effective Date**"), by and between:

> **PAZ GAMING INC.**, a corporation having its head office and principal place of business at 1204 Hartview Avenue, La Puente, CA, 91744, USA, including any Licensor's existing Affiliates (hereinafter collectively referred to as "**Licensor**")

**AND**

> **DEQ SYSTEMS CORP**, a Canadian corporation having its head office and principal place of business at 1840 1st Street, suite 103-A, Levis, Quebec, G6W 5M6, including any Licensee's existing Affiliates (hereinafter collectively referred to as "**Licensee**")

Licensor and Licensee are individually referred to as a "**Party**" and collectively referred to as the "**Parties**".

## RECITALS

**WHEREAS** Licensee is a publicly traded company that is engaged in the license and sublicense of intellectual property relating to table games, electronic systems for table games and other gaming equipment that holds gaming licenses in many jurisdictions throughout the United States and elsewhere as necessary to conduct its business;

**WHEREAS** the Licensor wishes to grant the Licensee the right to sublicense the Game (as defined herein) to Customers (as defined herein) under the terms and conditions set forth herein and the Licensee wishes to enter into such an agreement;

**NOW THEREFORE**, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto hereby agree as follows:

## 1. DEFINITIONS

"**Affiliate**" means any Person that is Controlled by, under common Control with, or Controls a party.

"**Change in Control**" means the occurrence of any of the following: (i) a party sells or transfers all or substantially all of its assets to any other Person that is not, as of the Effective Date, an Affiliate of such party; (ii) the acquisition of 50% or more of the voting stock of a party by any Person; or (iii) the merger of a party with or into any Person that is not, as of the Effective Date, an Affiliate of such party, or the dissolution of a party and the assumption of its business by any

---

Initials 

Person that is not, as of the Effective Date, an Affiliate of such party.

**"Confidential Information"** means information relating to the business or products of either Licensor or Licensee which is of an intellectual, technical, scientific or industrial nature in which either Licensor or Licensee has a proprietary or ownership interest or has a legal or contractual duty to protect including, without limitation, trade secrets, technical data, concepts, drawings, photographs, specifications, standards, manuals, designs, reports, formulae, software, databases and software documentation, whether it is registered or not before the competent Intellectual Property authority inside the Territory, any other information or material which by its nature should reasonably be understood to be confidential, in whatever medium (oral, written, electronic, etc.). Confidential Information shall also specifically include the terms and conditions of this Agreement. Confidential Information specifically does not include information that: (i) is in the public domain either at the time of disclosure or becomes public subsequently through no fault of either party; (ii) is lawfully known to the party receiving the information at the time of disclosure by the other party; or (iii) comes into a party's knowledge or possession from a third party without breach of this Agreement or other confidentiality agreement.

**"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities, partnership or other ownership interests, by contract or otherwise), provided that, in any event, any Person that owns or holds, directly or indirectly, fifty percent (50%) or more of the voting securities, partnership or other equity interests of any other Person will be deemed to control such Person.

**"Customer"** shall mean a legally operated casino establishment which enters into, or wishes to enter into, a sublicense agreement with the Licensee to offer the Game to its patrons.

**"Game"** shall mean a house game designed to be dealt by a croupier for casino patrons to play in the main casino called Win, Place & Show. Players play against the house and not against other players and bet on a winning card symbol in a race-style game. The Game rules can differ from the initial documentation provided by Licensor in order to adapt to the Customer needs. It shall therefore include its variations and improvements as determined necessary by Licensee at its sole discretion.

"Intellectual Property" shall include the following, without limitation, U.S. patent #6,079,713, the trademarks, and any copyrights, trade secrets and other proprietary rights, in intangible property, existing now or in the future relating to the Game, the Game improvements and its variations, and including any applications, renewals, continuations, extensions and restorations thereof along with their worldwide equivalents.

**"Licensee's Product(s)"** shall mean, without limitation, any table game or side bet, system, equipment or product that Licensee now or in the future developed, owned or commercialized by, or licensed to, Licensee, whether such product is owned or co-owned by Licensee, or licensed to Licensee by a third party. This includes but is not limited to, the G3 jackpot, bonusing and loyalty system, the EZ Trak tracking system and the electronic dealing shoe.

"**Person**" means an individual, corporation, partnership, joint venture, trust, unincorporated organization or similar organization or any other legal entity.

"**Territory**" shall mean the world.

**2. LICENSE**

2.1 <u>License Grant.</u> Subject to the terms and conditions set forth in this Agreement, Licensor hereby grants to Licensee an exclusive license under the Intellectual Property to make, use, import, sell, lease and offer to sell and to lease, and sublicense ("Use"), the Game as a live table game, electronic, online or internet implementations to Customer in the Territory (the "License").

2.2 <u>Right to use with other equipment.</u> Licensor acknowledges and agrees that Licensee may manufacture, import, export, offer to sell or lease, sell or lease and otherwise use any Licensee's Products in association with the Game without any restrictions and at no additional cost to Licensee, and Licensor hereby grants such rights to Licensee, if any and if at all required, under the License.

**3. FEES**

3.1 <u>Customer Fee.</u> Licensee shall sublicense the Game to Customers at a fixed monthly rate established at Licensee's sole discretion.

3.2 <u>Royalties.</u> For every Game installed at a Customer's premise, Licensee shall pay to Licensor twenty percent (20%) of the amount paid by any Customer to Licensee for making the Game available to play for the Customer's patrons.

3.3 <u>Royalties Reduction or Extinguishment.</u> If Licensee must pay a third party to obtain a license in order to Use the Game without infringing the third party's intellectual property, royalties to Licensor shall be reduced by the amount due under the license with the third party. For instance if Licensee must pay a third party 10% royalties, royalties to Licensor shall be reduced by 10%. No royalties shall be due by Licensee to Licensor for Game placements in a country where any part of the Intellectual Property is not filed, fails to issue, or becomes invalid or unenforceable, unless otherwise agreed in writing by the Parties.

**4. PAYMENT, REPORTING AND AUDITS**

4.1 <u>Invoicing.</u> Licensee shall be responsible for sending Customers' invoices at the beginning of the month for the total amount due by Customer for that month, and shall indicate that such amount is payable by Customer to Licensee within thirty (30) days of the date of invoice, unless other terms are required by the Customer's sublicense agreement.

4.2 <u>Payment to Licensor.</u> Licensee shall transfer the Royalties as defined in Subsection 3.2 of

Initials 

the gross revenue received by Licensee within thirty (30) days of the Customers payment receipt. All amounts shall be paid by Licensee to Licensor by check in U.S. dollars or by such other means as mutually agreed by the parties.

4.3 <u>Reporting and Audits.</u> At the time of payment under Section 4.2, Licensee will send to Licensor a report of the gross revenue received. Licensee shall keep full and continuous, true and accurate books of account containing all particulars that may be reasonable for the purpose of verifying the accuracy of the amounts payable and paid to Licensor hereunder. Records shall be kept by Licensee for three (3) years following the end of the reporting period to which they pertain. Licensor shall have the right to inspect such records no more than once per year during the term of this Agreement, during regular business hours and at its own cost.

## 5. OBLIGATIONS AND RESPONSIBILITIES OF LICENSEE

5.1 <u>Game Regulatory Compliance.</u> Where required, Licensee shall use commercially reasonable efforts to obtain the appropriate regulatory licences, permits and approvals required to offer the Game for use by Customer in the Territory. Licensor shall cooperate with Licensee as necessary for Licensee to obtain such licenses, permits and approvals, including providing any information that may be required by such regulatory authorities. Licensee's prosecution of such licenses, permits and approvals shall be at Licensee's sole cost and expense.

5.2 <u>Compliance notice.</u> Licensee shall notify Licensor by email of any jurisdictional application to obtain the appropriate regulatory licences, permits and approvals required to offer the Game for use by Customer in a given jurisdiction.

5.3 <u>Servicing, Installation and Training.</u> Licensee shall be solely responsible for the installation, service and technical support of the Game(s) installed under this agreement. Licensor shall cooperate and assist Licensee on training for the Game, as deemed necessary by Licensee.

## 6. OBLIGATIONS AND RESPONSIBILITIES OF LICENSOR

6.1 <u>Cooperation with Regulatory Authorities.</u> Notwithstanding Section 5.1 above, in the event that regulatory authorities require Licensor to obtain a license, qualification or finding of suitability in order to receive any amount pursuant to this Agreement or to otherwise fulfill the terms of this Agreement, Licensor shall cooperate with all regulatory authorities in connection with the provision in a timely manner of such documents or other information as may be requested by such regulatory authorities at its sole cost and expense.

6.2 <u>Intellectual Property and Game Information.</u> Licensor shall obtain and maintain in full force any and all Intellectual Property associated with the Game at its sole cost and expense.

6.3  Intellectual Property Sale. In the event Licensor wishes to sell or transfer to any third party any and all of the Intellectual Property, or a portion thereof, Licensor agrees to grant the Licensee a right of first refusal to acquire the Licensor's Intellectual Property at fair market value. In the event the Licensor and the Licensee are unable to agree to a fair market value, the parties shall rely on the services of an independent patent valuation expert to be chosen and agreed upon by both parties.

6.4  Taxes. Licensor shall comply with and shall be solely responsible for paying its own taxes on all revenue received under the terms of this Agreement.

6.5  Intellectual Property Infringements. :

   (i)  Licensor shall be obligated to maintain and defend its Intellectual Property and to pay the associated legal costs. Licensor shall be responsible for prosecuting or defending from patent infringements related to the Game at its sole expense. Any recovery of damages by the Licensor undertaking such enforcement or defense shall be applied first to reimburse Licensee for expenses and reasonable attorney's fees incurred by Licensee in connection with such suit, and the portion of the damages remaining, if any, shall be shared by the Parties in proportion with their respective shares of the litigation expenses in such infringement action. At the reasonable request of the Licensor undertaking action, the Licensee shall cooperate in all reasonable respects, testify when requested and make available any relevant information. The Licensor undertaking action and requesting assistance shall reimburse reasonable expenses incurred by the Licensee in providing such assistance.

   (ii)  In the event that Licensee is notified of an infringement claim and subject to Section 6.5 (i) above, suit, demand or action ("Action"), Licensee shall give Licensor prompt written notice thereof and details of all prior claims relating thereto. If Licensor does not prosecute an infringing act within ninety (90) days after being notified of the allegation, Licensee shall have the right, but shall not be obligated, to prosecute at its expense, and Licensor may be included as a party (as required by law). No settlement, consent judgment or voluntary final disposition shall be entered into by Licensee without the prior written consent of Licensor, which shall not be unreasonably withheld.

   (iii)  In the event of an Action, Licensor's obligations of indemnification and defense of Licensee in accordance with Section 6.5 and Section 9.1 herein shall be conditioned upon handling of any claim, suit, demand or action by legal counsel of Licensor's choosing at Licensor's sole discretion. Licensor agrees to keep Licensee reasonably informed of all material developments in connection with any such Action and shall have full control to resolve any claims or action subject to Licensor's indemnification obligations herein, provided that Licensor shall not settle or compromise any suit that adversely affects the licensed Game or

Intellectual Property, or any rights granted to Licensee hereunder, without the prior consent of Licensee, which consent shall not be unreasonably withheld.

## 7.    TERM AND TERMINATION

7.1    <u>Term.</u> This Agreement shall commence on the Effective Date and continue thereafter for a period of five (5) years unless terminated by either Party in accordance with this Section (the "Initial Term"). This Agreement shall automatically renew for an additional period of five (5) years ("Additional Term") unless Licensee provides Licensor with a written notice of its intent not to renew the Agreement at least sixty (60) days prior to the end of the Initial Term.

7.2    <u>Termination without cause.</u> Licensee may terminate this Agreement for any reason or no reason by providing the other Party thirty (30) days written notice of termination.

7.3    <u>Termination for cause.</u> Notwithstanding Section 7.2 above, this Agreement may be terminated in the following events ("Event"):

(iv)    By either Party, if the other Party is in default of any material provision provided in this Agreement, including but not limited to a default of payment, and such default is not cured within thirty (30) days after receipt of written notice of default;

(v)    At any time by either Party if, by the actions of the other Party, the other Party is subject to significant disciplinary action or is placed in jeopardy of losing or becoming unable to obtain or reinstate any federal, state and/or foreign registration, license or approval material to its business, and such default is not cured within thirty (30) days after receipt of written notice of default or such other delay requested by any regulator. Such termination shall be without further liability of the terminating party;

(vi)    At any time, by either Party, if the other Party made any misrepresentation or false statement in this Agreement; and

(vii)    At any time, by either Party if the other Party (a) is subject to a reorganization, dissolution or liquidation petition, or ceases its business; (b) becomes insolvent or seeks protection, voluntarily or involuntarily, under any bankruptcy law; (c) is assigned or conveyed to a liquidating agent, trustee, mortgagee or assignee of whatever description; (d) is marked of any judicial levy against all or a substantial percentage of its assets for the benefit of its creditors; or (e) is appointed a receiver, keeper, liquidator or custodian of whatever description for all or substantial portion of its assets.

7.4 <u>Obligations upon termination.</u> Upon expiration or termination of this Agreement for any reason:

    (i)    Licensee shall cease any activities under the License, except that Licensee shall be permitted to fulfill any obligation contracted by Licensee on or before the date of expiration or termination for any reason that have not yet been delivered to the gaming operator at such date.

    (ii)    Licensor shall further assist in preventing any disruption of service or supply of the Game to gaming operators.

    (iii)    Games in operation at the date of expiration or termination may continue to operate for as long as Licensee pays the applicable License Fees to Licensor as per Section 3.2 until each gaming operator terminates its Customer agreement with Licensee.

## 8. REPRESENTATIONS AND WARRANTIES

8.1 <u>Licensee's representation.</u> Licensee represents that it has the full power and authority to enter into this Agreement and perform all of its obligations hereunder, and that the person or entity actually executing this Agreement has all requisite authority to do so on behalf of Licensee.

8.2 <u>Licensor's representations.</u> Licensor represents and warrants that:

    (a)    it has the full power and authority to enter into this Agreement and perform all of its obligations hereunder, and that the person or entity actually executing this Agreement has all requisite authority to do so on behalf of Licensor;

    (b)    it has obtained any and all necessary approvals from any third party, if any, to grant the rights granted hereunder to Licensee, and by executing and performing this Agreement, Licensor will not be in breach of any agreement with any other third party;

    (c)    it has good title in and to the Game and Intellectual Property rights relating thereto;

    (d)    as of the Effective Date, to Licensor's knowledge, no lawsuit for patent infringement has been brought against it or any Customer by a third party pertaining to the use of the Game; and

    (e)    the Game does not infringe any valid, enforceable claims of any third party patent.

8.3 <u>No other warranties.</u> EXCEPT AS SET FORTH ABOVE, THERE ARE NO OTHER WARRANTIES

EITHER EXPRESS OR IMPLIED, AND ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED.

## 9.    INDEMNIFICATION

9.1    <u>Indemnity.</u> To the fullest extent permitted by law, Licensor hereby agrees to indemnify, defend and hold harmless Licensee and its affiliates and subsidiaries (hereinafter the "Indemnified Parties"), and their respective directors, officers and employees from and against any and all claims, suits, demands, actions, liabilities, damages, losses, costs and expenses, including without limitation, reasonable fees and disbursements of counsel arising in connection with or incident to (a) any claim that the Game, or Intellectual Property or any component thereof infringes a patent, trademark, copyright, trade secret or any other proprietary rights or licensing rights of any third party; (b) a breach of any representation or warranty of Licensor under this Agreement; and (c) Licensor's negligence, wrongful acts or omissions. Upon an indemnity request by Licensee, Licensor shall reimburse Licensee for reasonable and necessary disbursements which would be covered by this section within thirty (30) days of presentation to Licensor by Licensee of an invoice or other supporting evidence of such disbursement by Licensee. The indemnification obligation shall not be limited in any way by a limitation on the amount or type of damages, compensation or benefits payable by Licensor to the Indemnified Parties, except that the indemnification obligation herein shall not extend to any claim of lost profits or revenues by Licensee, and Licensor shall not otherwise be responsible for and Licensee shall have no claim against Licensor for lost profits or revenues.

9.2    <u>Indemnification non-exclusive.</u> The indemnification obligation shall not be construed to negate, to bridge, to waive or to reduce any other of Licensee's rights and remedies or Licensor's obligations of indemnity which would otherwise exist as to the Indemnified Parties.

9.3    <u>Termination.</u> Licensee may, in its sole discretion, at any time immediately upon notice to Licensor and without further liability to Licensor, suspend the performance or terminate this Agreement if: (i) Licensee becomes aware, or is notified of the filing of any Action (as defined in Section 6.5) alleging that the Game or licensed Intellectual Property or any component thereof infringes a patent, trademark, copyright, trade secret or any other proprietary rights or licensing rights of any third party; or (ii) if, Licensee determines in its sole discretion that the performance of this Agreement may adversely affect Licensee's business; or (iii) if Licensee determines in its sole discretion that the performance of this Agreement may place Licensee in jeopardy of having any of its licenses, permits or approvals required to its business suspended, denied, restricted or revoked.

## 10.    CONFIDENTIALITY

10.1    <u>Confidentiality Obligations.</u> During the Initial Term and Additional Term of this Agreement, each Party shall (i) use the Confidential Information solely for the purpose of performing, and solely to the extent necessary to perform, its obligations under this Agreement; (ii) protect the Confidential Information of the other Party from disclosure to others, using the same degree of care used to protect its own proprietary

---



information; (iii) not disclose the Confidential Information of the other Party to anyone without the other Party's prior written consent, and provided that such Person has a "need-to-know" such Confidential Information and accepts to be bound in writing to protect the Confidential Information from unauthorized use and disclosure. Each Party has the right to injunctive relief in the event of any breach or threatened breach of this Section.

10.2 <u>Effect of Termination.</u> Upon termination of this Agreement, any use of Confidential Information of the other Party shall cease, and all such Confidential Information, including summaries and copies of it, shall be returned or destroyed immediately upon request of the other Party. The Confidentiality Obligations set forth in Subsection 11.1 of this Agreement shall survive termination or expiration of this Agreement. In particular, upon termination of this Agreement and thereafter, each Party shall not reveal, divulge, make known, sell, exchange, lease or in any other way transfer to third parties any Confidential Information developed in connection with this Agreement. Each Party agrees that monetary damages for breach of its obligations under this Section 11.2 may not be adequate and that the other Party will be entitled to injunctive relief with respect thereto.

10.3 <u>Subpoena, administrative or judicial request.</u> In the event that disclosure of Confidential Information is required by subpoena or other judicial or administrative process, the Party being requested to such disclosure shall promptly inform the other Party of such request so that the latter can obtain appropriate remedy or waive the other Party's obligation in connection with that particular disclosure. In any event, the Party required to do so shall disclose only that portion of the confidential information that it is legally required to disclose.

10.4 <u>Public statements.</u> Neither Party shall disclose any of the terms or conditions, issue any public statement, informational release or consent to any interview relating to this Agreement or its activities under this Agreement without the prior written consent of the other Party, and the contents of any press release relating to this Agreement shall be approved by both Parties prior to dissemination.

## 11. GENERAL AND MISCELLANEOUS

11.1 <u>Gaming Regulations.</u> This Agreement, and its terms and conditions, shall be conditioned upon approval of the applicable gaming regulations and regulators ("Regulators") where required. It is understood and agreed by and between the Parties that if, at any time, either prior to or subsequent to the Effective Date of this Agreement, a Regulator shall render a final determination denying, suspending or revoking the license of either Party necessary to conduct business with the other Party, disapproving of the use of the Game or any part or feature thereof which is the subject of this License, or disapproving any material terms or conditions of this Agreement, then the Parties shall discuss in good faith options for modifying this Agreement as necessary to allow such Agreement to continue without violating such final determination. If the Parties are unable to

mutually agree on a satisfactory modification, then this Agreement shall be deemed terminated as of the date required by the Regulators. Neither Party shall be deemed in default under any provision of this Agreement, provided that such Regulator's disapproval was not the result of a breach of this Agreement by either Party.

11.2    Entire Agreement.  This Agreement embodies the entire agreement between the Parties with regard to the subject matter hereof and shall supersede all prior written or oral agreements or contemporaneous discussions, negotiations, correspondence or other understandings between the Parties, relating to this Agreement. This Agreement may be modified only by a writing signed by both Parties hereto.

11.3    Severability. If one or more of the terms or provisions or conditions of this Agreement or the application thereof shall for any reason be held to be invalid, void, illegal or unenforceable in any effect, the validity, legality and enforceability of the remaining provisions hereof and any other applications thereof shall in no way be affected or impaired or invalidated and shall remain in full force and effect.

11.4    Waiver. The failure of either Party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

11.5    Relationship of the Parties. The relationship between Licensee and Licensor is that of independent contractors. Neither Party has any authority to act for any other party as an agent, partner, or joint venture as a result of this Agreement. Neither Party shall have the right or authority whatsoever to bind the other Party to any agreements, promises, or undertakings. Except as is expressly set forth herein, each Party shall bear full and sole responsibility for its own expenses, liabilities, costs of operation and the like.

11.6    Force Majeure. Neither Party shall be liable for damages, including liquidated damages, if any, for delays in delivery or failure to perform due to causes beyond the control and without the fault or negligence of the Party.  Such causes include but are not limited to, acts of God, acts of the public enemy, acts of governments (including Tribal Governments), fires, floods, epidemics, quarantine restrictions, strikes, or embargoes.

11.7    Notice. Any and all notices or demands provided for, permitted or required to be given in this Agreement ("Notice") shall be in writing and be conclusively deemed to have been received as follows: (a) if delivered by hand: at the time of delivery to the Party entitled to receive such notice; (b) if sent by fax or email: at the time indicated on the transmittal confirmation receipt; or (c) if sent by registered or certified mail or by overnight courier service: two (2) business days from the date of sending. Any Notice shall be addressed to the name and address of the Party entitled to receive the same as stated in the identification of the Parties, unless that Party informed the other Party of any change therein.

Initials 

11.8 <u>Governing Law.</u> The terms of this Agreement shall be interpreted, governed by and construed in accordance with the laws of the Province of Quebec, Canada without regard to the conflicts of law provisions.

11.9 <u>Assignment.</u> Neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement to any third party without the prior written consent of the other Party, which shall not be unreasonably withheld. Notwithstanding the foregoing, Licensee may assign or transfer this Agreement, in whole or in part, to any Affiliates of Licensee upon notification to Licensor.

11.10 <u>Change of Control.</u> In the event of a Change of Control of either party, this Agreement and all rights and obligations thereunder shall be binding upon its successor upon the effective date of the Change of Control.

11.11 <u>Cooperation.</u> Licensor agrees, upon the written request of the Licensee, to do all things and sign all documents, titles, deeds, assignments and the like and is committed to ensuring that these gestures are posed and these documents are signed whenever it is in his power to do so, to meet the reasonable requests of the Licensee to take such action and sign such documents when it is deemed necessary or desirable to give effect to this contract. These requests formulated from time to time must be reasonable.

11.12 <u>Counterparts.</u> This Agreement may be executed in counterparts, with the same effect as if all Parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument. For the purposes of execution and delivery of this Agreement, a facsimile signature shall be deemed an original.

11.13 <u>Currency.</u> All amounts set forth in this Agreement are in U.S. currency.

**IN WITNESS WHEREOF,** the Parties hereto have caused this agreement to be effective on the Effective Date set forth above.

**PAZ GAMING INC.**
"Licensor"

**DEQ SYSTEMS CORP.**
"Licensee"

Signature:_____
By: Jesse J. Paz
Title:

Signature:_____
By : François Proulx
Title : Interim President and CFO